THE PEOPLE ex rel. Frank C. Vaughan, County Collector, Appellee, vs. THOMAS SCANLAN et al. Appellants.

*Opinion filed December 16, 1914.*

1. DRAINAGE—*when drainage commissioners have no power to make oral contract.* Under section 35 of the Farm Drainage act drainage commissioners have no power to enter into an oral contract, on a private bid, for work in the district which is to cost more than $500.

2. SAME—*when an additional drainage assessment is invalid.* Where a farm drainage assessment is levied to pay the cost of cleaning out and improving a certain portion of the main ditch, for which work a written contract is entered into with the lowest responsible bidder, but thereafter the commissioners make an oral contract with the same contractor to clean out and improve another portion of the ditch and pay for the work out of the assessment already levied, they have no power to make an additional assessment to replace the money so wrongfully diverted.

3. SAME—*the commissioners must proceed legally though commanded by order of the court to do the work.* The fact that drainage commissioners are commanded by an order of the circuit court in a *mandamus* suit to proceed to make necessary surveys and estimates and to levy an assessment for improvements found by the court to be necessary, does not relieve the commissioners from proceeding in accordance with the provisions of the statute in obeying such order.

4. APPEALS AND ERRORS—*bill of exceptions need not expressly state that it contains all the evidence.* The fact that the bill of exceptions contains all the evidence need not appear by an express statement to that effect in the bill itself or the certificate of the trial judge if it sufficiently appears from expressions in the bill, which, considered collectively, are equivalent to such statement.

5. SAME—*effect where last day for filing appeal bond falls on Sunday.* Where the last day of the period fixed by the court for filing an appeal bond falls on Sunday it is sufficient if the bond is filed on the succeeding day.

APPEAL from the County Court of Lee county; the Hon. ROBERT H. SCOTT, Judge, presiding.

BROOKS & BROOKS, for appellants.

265 – 39

HARRY EDWARDS, State's Attorney, CHARLES H. WOOS-TER, and TRUSDELL, SMITH & LEECH, for appellee.

Mr. JUSTICE COOKE delivered the opinion of the court:

This is an appeal from a judgment of the county court of Lee county rendered against the appellants' property for alleged delinquent assessments levied by Union Drainage District No. 1 of the towns of Harmon and Marion, in Lee county.

Union Drainage District No. 1 was organized under the Farm Drainage act and certain improvements were made. Several years thereafter, and on February 9, 1912, the circuit court of Lee county issued a writ of *mandamus* on the petition of certain land owners of the district, directing the commissioners to proceed at once to cause to be made a survey and an estimate of the expense of deepening, widening, cleaning out and improving the main ditch in the said district through its entire length, from the outlet on the west line of section 27 in said town of Harmon, so as to provide sufficient drainage for the lands within the district. The commissioners thereupon employed an engineer, who on June 18, 1912, made a written report to the commissioners, which is designated as "Engineer's report No. 1," wherein he made recommendations for the improvement of the main ditch from the outlet on the west line of said section 27 in the town of Harmon to the east line of section 30 in the town of Marion. The ditch was divided into stations, the station at the outlet being No. 0 and the one at the east line of said section 30 being No. 231. The stations were one hundred feet apart. There is a bridge over the ditch at station No. 231, known as the Blackburn bridge. The engineer estimated that the amount of excavation necessary between stations 0 and 231, in order to improve the ditch to the necessary width and depth and to place it in proper condition, was 53,144 cubic yards, which he estimated would cost $7997.10 to re-

move. Thereafter, on July 15, 1912, the commissioners of the district held a meeting, as is disclosed by their records, for the purpose of conferring on the matter of the addition of certain lands to the district and to ascertain the liabilities and outstanding indebtedness of the district and the "probable cost of the work of the proposed cleaning, repairing and otherwise bettering the condition of the main ditch of the above mentioned district, and then and there did authorize a levy of eleven thousand five hundred four and 97/100 dollars, ($11,504.97,) and ordered the clerk of the board of commissioners to make the levy as aforesaid," according to the classification of the lands of the district. This is the only record showing the making of this levy or the purpose for which it was made. Thereafter, on July 30, the commissioners advertised for bids for the proposed improvement in the district, which was described as follows: "Cleaning out, alteration of course and improvement of banks of the present existing open ditch, known as the main ditch, in the said district, said improvement extending from the intersection of said ditch with the west line of section No. 27 in said Harmon township to the intersection of said ditch with the east line of section No. 30 of said Marion township." By the advertisement the twenty-second day of August, 1912, was fixed upon as the day the commissioners would receive bids at the Harmon Bank, in the village of Harmon, for the construction of the proposed work. On that day the commissioners met, and the bid of Henry P. Johnson "to clean out the said main ditch and remove the dirt according to said plans and specifications for the sum of fourteen cents (14c) per cubic yard," being the lowest bid, was accepted and a written contract was entered into between said Johnson and the commissioners on November 5, 1912, for the doing of the work set forth in the advertisement at the price specified in the bid. The plans and specifications referred to were not offered in evidence.

On September 6, 1912, the engineer made his report designated as "Report No. 2," in which he made recommendations for the improvement of the ditch between stations 231 and 283, lying east of the Blackburn bridge. On November 1, 1912, the engineer made his report No. 3 to the commissioners, in which he made recommendations for the improvement of the ditch up to and including station 320, which was at the limits of the district. This last report also was in reference to work to be done east of the Blackburn bridge. By reports Nos. 2 and 3 the engineer recommended considerable new work to be done by way of excavating a new ditch. His estimate for the cost of the work to be done east of the Blackburn bridge, or station 231, including both the excavation to be made in the old ditch and the excavation of new ditches, and the estimate of $531.90 for the costs of a new right of way, was $2876.78.

When Johnson arrived on the ground with his machinery to do the work, instead of beginning upon that portion of the ditch described in his contract he placed his dredge east of the Blackburn bridge, and under an oral contract thereupon entered into between himself and the commissioners without any advertisement or public letting, whereby it was agreed he should be paid fourteen cents per cubic yard for excavating new ditches, he proceeded to do the work contemplated and recommended by the engineer in his reports Nos. 2 and 3. As this work progressed the commissioners paid him therefor out of the assessment of $11,504.97 made by them at their meeting on July 15, 1912.

It does not satisfactorily appear from the record just how much money was paid for that part of the improvement east of the Blackburn bridge, but there is sufficient in the record to show that it amounted to more than the estimate of the engineer. After completing the work east of the Blackburn bridge, which he performed under oral contract with the commissioners on his private bid, Johnson

then started at station 231 and proceeded westward upon the work provided for in his written contract until he arrived at station 77. At that time the funds of the district were exhausted and the work ceased. The commissioners thereupon submitted a report to the circuit court of Lee county in the *mandamus* suit, and petitioned the court to enter an order authorizing them to levy a further and additional assessment upon the lands of the district to enable them to complete the work from station 77 to the outlet of the main ditch. The court thereupon entered an order finding it necessary that a further assessment be made, approved the report of the commissioners, and ordered that the commissioners proceed, without unnecessary delay, to levy an additional assessment for the purpose of defraying the costs and expenses of completing the work from station 77 to the outlet of the ditch. Thereafter the commissioners met on June 28, 1913, and the following record was made: "Motion made and seconded, $4020.40 be levied on lands of district according to classification on record and compliance with order of court June 27, 1913." Thereafter the assessment was spread upon the lands of the district according to the classification, and it was this assessment on the lands of objectors that was returned delinquent and concerning which this controversy arose.

Numerous objections were filed by appellants to the collection of this assessment. The objections that the assessment is based on an invalid classification, that the lands of William Morrissey were not legally included within the district and classified, that the assessment on the lands of George W. Swartz was not made upon the proper classification, and that the assessment was made, in part, to pay an indebtedness owing to the Bank of Harmon, are not supported by the record, the proof in regard to these various matters being either insufficient or consisting of incompetent evidence.

It is objected that the record of the commissioners is not a sufficient basis for the spreading of the assessment and the levy of the tax. While the record, which we have above set out, is informal and not in compliance with section 26 of the Farm Drainage act, the commissioners were powerless to make this assessment even though they had proceeded in strict conformity with the statute by passing a resolution as is therein contemplated. While it may fairly be inferred that the commissioners contemplated from the outset to make all the improvements necessary in the district, as well those needed above the Blackburn bridge as those needed below, it is apparent from the state of the commissioners' record that the first assessment was levied on the lands of the district for the purpose of cleaning and improving the main ditch from its outlet to station 231, at the Blackburn bridge. At the time this assessment was ordered to be spread the commissioners had received only one report (No. 1) from their engineer, which was in reference only to the improvement of the ditch up to station 231. The advertisement for the letting of the work and the contract with Johnson to do the work applied specifically to that portion of the ditch, only. Reports Nos. 2 and 3 of the engineer were not received until after the first assessment had been spread, advertisement for the construction of the work had been made, the bids received and the contract awarded. The commissioners acted clearly in violation of the plain provisions of the statute when they entered into an oral contract with Johnson, on a private bid, to do the work recommended by the reports of the engineer to be done east of the Blackburn bridge. The engineer estimated the total cost of the work to be $2344.88. Section 35 of the Farm Drainage act specifies the manner of letting contracts for work where the cost of the entire work exceeds $500. Under this section, notice must be given of the time and place of the letting, the kind and amount of work to be done and where plans of the same

may be seen, by publication for twenty days in some news-
paper printed and published in the county, and the bids are
required to be under seal.   To enter into a contract with
Johnson, on a private bid and without a public letting, to
improve that part of the district east of the Blackburn
bridge according to the plans and specifications of the en-
gineer was a violation of the statute and a plain diversion
of the funds of the district from the purpose for which
they had been raised by special assessment.   Having di-
verted the funds raised for the express purpose of improv-
ing that portion of the district between stations o and 231,
the commissioners have no power to levy an additional as-
sessment to replace the funds so wrongfully diverted.   The
objection of appellants that the assessment to replace funds
which had been wrongfully diverted was illegal should have
been sustained.

The appellee meets this objection apparently upon the
theory that the whole of the proposed work in the district,
both that east of the Blackburn bridge as well as that west
of it, constituted a single unit and was all work which the
commissioners were authorized to have done, and that the
contract of Johnson was to do but a part of the whole
work for which the original assessment was spread.   It
does not explain, however, wherein that alters the situation
or authorizes the commissioners to make this additional as-
sessment.   More than enough money was realized from the
first assessment to complete the only valid contract made,
and it should have been used for that purpose.   The land
owners had the right, if all the work contemplated was to
be considered as one improvement, to have the whole of
it contracted for at a public letting, or at least to have it
so contracted for by sections.   The objections filed by ap-
pellants fully covered the situation, and the application for
judgment and for order of sale should have been denied.

The fact that the commissioners were commanded to
make necessary improvements in the district by the circuit

court did not relieve them of the necessity of proceeding in accordance with the provisions of the statute in complying with that order. The circuit court merely found that the improvements were necessary, and commanded the commissioners to proceed, without unreasonable delay, to cause a survey, an estimate of expenses and an assessment to be made and then to have the necessary work performed. This mandate did not relieve the commissioners from any duty imposed upon them by the statute. The further order made by the circuit court in the *mandamus* suit upon the petition of the commissioners, wherein they were ordered to proceed to make an additional levy to complete the work, did not authorize them to proceed illegally. The objectors were not parties to the *mandamus* suit, and this order was not procured by them or with their knowledge or consent.

Appellee contends that the bill of exceptions is insufficient because it is not shown, either by the certificate of the trial judge or otherwise, to contain all the evidence heard or considered by the court. We regard the bill of exceptions sufficient for the purpose of presenting the error which we have above considered, although there is no direct statement in the bill of exceptions, or in the certificate of the trial judge thereto, that it contains all the evidence. The bill of exceptions, in the beginning, recites that "the applicant, to maintain the issues on his behalf, offered and introduced in evidence the following, that is to say," after which appears the evidence offered in chief by the applicant, which made out a *prima facie* case, and at the conclusion of this evidence appears the statement, "and thereupon the applicant duly rested his case." Immediately following the language last quoted appears the following: "And thereupon the objectors, in order to maintain the issues on their part, offered and introduced in evidence the following, that is to say." The evidence offered by the objectors is then set out, followed by the statement of the attorney for the objectors, "We rest." Immediately after this state-

ment appears the following: "And thereupon the relator, in order to maintain the issues on his behalf, offered in evidence the following, that is to say," after which appears the evidence offered by the applicant in rebuttal, at the conclusion of which appears the statement made by the attorney for the applicant, "We rest," and this is followed by the judgment of the court.

In *Marine Bank of Chicago* v. *Rushmore*, 28 Ill. 463, objection was made to the bill of exceptions on the same ground here urged, and it was there said: "In the case of *Stickney et al.* v. *Cassell*, 1 Gilm. 420, and again in the case of *Harris et al.* v. *Miner*, at this term, this court held that it was immaterial whether the fact is expressly stated that the bill of exceptions contains all the evidence or is manifested in any other way. It is not expressly stated in this bill of exceptions that it contains all the evidence offered, but it states, after reciting the evidence, 'the testimony here closed.' This is equivalent to an express averment that it was all the evidence heard in the cause." So in the case at bar, those portions of the bill of exceptions above quoted, when considered collectively, are equivalent to an express averment that the bill of exceptions contains all the evidence heard in the cause. In *Cerny* v. *Glos*, 261 Ill. 331, the certificate of evidence disclosed practically the same situation as is presented by this bill of exceptions, and it was held that it showed, on its face, that it contained all the evidence.

Appellee also contends that the bond of appellants was not filed within the forty days allowed them in the appeal order in which to file their bond. Appellants filed their bond on the forty-first day after the order allowing the appeal. As the fortieth day fell upon Sunday, the bond was filed in apt time.

For the reasons indicated the judgment of the county court is reversed and the cause is remanded, with directions to sustain the objections.

*Reversed and remanded, with directions.*